**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**


| | |
|---|---|
| **FRANCES CZARNECKI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 12 C 7996** |
| **v.** ) | |
| ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |


## <u>MEMORANDUM OPINION AND ORDER</u>

Michael T. Mason, United States Magistrate Judge:

Claimant, Frances Mary Czarnecki ("Czarnecki" or "claimant") brings this motion for summary judgment [21] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Czarnecki's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i), 423(d) and 1382c(a)(3)(A). The Commissioner has filed a cross-motion for summary judgment [25], asking that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as defendant in this suit.

## I.    Background

### A.    Procedural History

On September 15, 2009, Czarnecki filed applications for DIB and SSI alleging that she became disabled on August 1, 2007 due to arthritis, a heart condition, fatty liver, back problems, and panic attacks.  (R. 153-62, 179.)  Her applications were denied initially on March 15, 2010, and upon reconsideration on July 29, 2010.  (R. 74-78, 91-98.)  Czarnecki filed a request for a hearing on August 23, 2010.  (R. 99-100.)  On June 21, 2011, Czarnecki appeared with counsel at a hearing before ALJ Karen Sayon.  On July 14, 2011, ALJ Sayon issued an unfavorable decision denying Czarnecki's request for benefits.  (R. 8-24.)  Czarnecki filed a timely request for review with the Appeals Council.  (R. 6-7.)  On August 21, 2012, the Appeals Council denied her request, at which point the ALJ's decision became the final decision of the Commissioner.  (R. 1-4.); *Estok v. Apfel,* 152 F.3d 636, 637 (7th Cir. 1998).  Czarnecki subsequently filed this action in the District Court and the parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c) [8].

### B.    Medical Evidence

#### 1.    Treating Physicians

Records reveal that claimant has been under the care of Dr. John S. Zielinski since 1998.  (R. 383-90.)  At an appointment with Dr. Zielinski back in 2004, she complained of joint pain in her hands and feet.  (R. 387.)

On May 10, 2007, Czarnecki was admitted to the emergency room of Advocate Christ Medical Center ("Advocate") for problems related to alcohol abuse.  (R. 258.)

She reported a twenty year history of drinking and a history of heart disease, for which she takes Aspirin and Benazepril. (*Id.*) She also reported a twenty year history of smoking two packs of cigarettes a day. (R. 260.) A liver ultrasound showed a large fatty liver and Czarnecki had low white blood and platelet counts. (R. 258, 357, 362.) Pulmonary and cardiac testing revealed unremarkable results, as did the physical examination. (R. 261, 361, 364.) Czarnecki was discharged after three days and advised to follow-up with her primary physician and to seek alcohol treatment. (R. 259.) She was also prescribed Xanax for anxiety. (*Id.*)

Claimant underwent a psychiatric consultation on June 7, 2007 at Pillars Community Services ("Pillars") due to her history of anxiety. (R. 401-07.) Claimant reported a troubled history of alcohol abuse and past feelings of depression. (R. 403.) She further reported symptoms possibly associated with bipolar disorder, such as increased energy and a decreased need for sleep. (*Id.*) The examining physician, which appears to have been Dr. Beresford, assessed anxiety, with a rule out for bipolar disorder, and noted a "current" Global Assessment of Functioning ("GAF") score of 50 and a "highest" GAF of 75. (R. 407.) Claimant returned to Pillars several more times throughout 2007, at times complaining of restlessness, anxiety, and nervousness, and also reporting alcohol abuse relapses. (R. 673-74.)

On January 7, 2008, claimant presented to the emergency room of Advocate after having a seizure related to alcohol withdrawal. (R. 332.) She reported drinking on a daily basis. (R. 333.) A chest x-ray showed no acute cardiopulmonary disease and a CT scan was primarily normal. (R. 344.) Claimant was prescribed Ativan for withdrawal symptoms and was again advised to seek alcohol treatment. (R. 339.)

3

On March 27, 2008, claimant returned to see Dr. Zielinski and complained of lower back pain and right hand pain. (R. 386.) A treatment note from Pillars on the same day reveals that claimant may have participated in a twenty-eight day rehab program for substance abuse. (R. 673.)

An MRI at Advocate from July 12, 2008 showed no significant abnormalities. (R. 331.) An EEG dated August 2, 2008 revealed no epileptiform discharges, no ictal events, and no significant slow-wave abnormalities. (R. 288.)

On November 4, 2008, claimant reported to Dr. Zielinski that she fell off a ladder and injured her back and neck. (R. 384.) Shortly thereafter, on November 13, 2008, claimant returned to Advocate after an incident involving shortness of breath, shaking, hyperventilating, and the inability to communicate. (R. 321.) A history of panic attacks, anxiety, and depression was noted. (R. 323.) Claimant denied use of alcohol. (*Id.*) A CT exam showed no acute intracranial process, and testing revealed a very low probability of acute cardiac ischemia. (R. 296, 330.) Claimant left Advocate against the advice of physicians. (R. 324.)

On January 16, 2009, claimant returned to Pillars complaining of poor sleep habits and anxiousness. (R. 672.) On February 9, 2009, claimant was brought to Advocate after suffering a seizure at an AA meeting. (R. 307.) A history of alcohol and cocaine abuse was noted, though claimant stated she had been sober for a year. (*Id.*) A CT showed no acute change. (R. 317.) Claimant was prescribed Norco and Valium and advised to follow-up with her primary physician. (R. 314.) By February 23, 2009, claimant was "doing well" and sober according to treatment notes from Pillars, though

she had not filled her prescriptions.  (R. 671.)

On May 5, 2009, Dr. Zielinski noted swollen legs.  (R. 383.)  Claimant continued to complain of low back pain to Dr. Zielinski on June 23, 2009 and August 4, 2009.  (R. 383.)  Pillars treatment notes from August 13, 2009 reveal claimant was not taking her medications.  (R. 671.)  She was not sleeping well and felt anxious and stressed about money.  (*Id.*)

On September 1, 2009, claimant underwent an MRI of the lumbar spine at Dr. Zielinski's referral.  (R. 378-79.)  That MRI showed degenerative levorotoscoliosis of the thoracolumbar spine, with a Cobb angle of approximately 8 degrees, as well as multilevel degenerative disc disease and facet arthropathy, with associated central spinal canal stenosis and foraminal narrowing.  (R. 379.)  Shortly thereafter, Dr. Zielinski referred claimant to a pain clinic.  (R. 390.)  Also, on September 10, 2009, claimant reported to her physician at Pillars that she was doing better, had decreased anxiety, but had recently lost her job.  (R. 670.)

Claimant was examined at Rush University Medical Center on September 21, 2009 for low back pain and leg pain.  (R. 415.)  She reported a ten year history of low back pain and further reported that she fell from a ladder twice in the last year.  (*Id.*)  Walking, sitting, coughing, standing, lying, bending, and stair climbing increase her pain.  (*Id.*)  The treatment notes reveal that claimant was taking Norco, Zoloft, and Xanax.  (*Id*).

The physical examination at Rush revealed lumbar flexion of 80 degrees with minimal pain, extension of 30 degrees, bilateral bending of 30 degrees, and tenderness at the lumbosacral junction.  (R. 415.)  The examining physician reviewed the recent

MRI of the lumbar spine and noted very mild stenosis at L2-L3, L3-L4, and L4-L5, as well as a possible small degree of spondylolisthesis at L4-L5. (*Id.*) The physician assessed lumbar spinal stenosis and recommended a series of epidural injections. (*Id.*) He also provided samples of Celebrex for pain. (*Id.*)

Records reveal that claimant was admitted to Little Company of Mary Hospital on January 12, 2010 and stayed for five days. (R. 498.) The reason for this admission is unclear.

Claimant began treatment with Dr. Win Myint on February 1, 2010 for a history of a right club foot, right hand arthritis, and chronic back pain. (R. 513.) After a largely unremarkable physical examination, Dr. Myint assessed, among other things, degenerative disc disease, sleep disturbance, chronic bronchitis, and depression. (R. 514.) At a follow-up appointment on February 26, 2010, Dr. Myint noted that claimant had filed for disability and needed paperwork filled out. (R. 515.) In a letter dated March 15, 2010, Dr. Myint reported that claimant cannot sit, stand, or walk for more than ten minutes, cannot lift greater than five pounds, and cannot keep a meaningful job due to her back problems, anxiety, and depression. (R. 393.)

On March 11, 2010, claimant saw Dr. Nayeh Mirshed for heartburn, chronic back pain, and depression. (R. 544.) She described her back pain as constant, severe, dull, and aching. (*Id.*) She reported a previous work up at Rush, after which surgery was recommended, and also that injections had not provided her any relief in the past. (*Id.*) She described an anxious mood, decreased appetite, fatigue, and sadness, but denied suicidal ideations. (*Id.*) Claimant admitted to a one to one and a half pack a day smoking habit, but denied alcohol or substance abuse. (R. 545.)

Upon physical examination, Dr. Mirshed described claimant as anxious and obese. (R. 545-46.) He noted a normal gait, a decreased range of motion of flexion and extension of the back, and tenderness in the lumbar and thoracic spine area. (R. 546.) Straight leg testing was negative. (*Id.*) Dr. Mirshed assessed lumbar spinal stenosis, but opined that claimant should be weaned off her medications. (R. 547.) He recommended she apply moist heat and avoid bending, lifting, and stooping. (*Id.*) Dr. Mirshed also assessed depression. (*Id.*) He discontinued her Xanax and increased her dosage of Zoloft, and also advised increased physical activity and social interaction. (*Id.*) He prescribed Prilosec for heartburn. (R. 548.) Dr. Mirshed reported almost identical findings and recommendations at a follow-up appointment on April 9, 2010. (R. 549-51.) At that time, he put claimant back on Xanax. (R. 551.)

By April 26, 2010, claimant reported to Dr. Myint that her back pain was well-controlled with Cymbalta, Mobic, and Vicodin. (R. 517.) Claimant returned for follow-up visits with Dr. Myint and prescription re-fills on May 27, 2010, June 22, 2010, and July 20, 2010. (R. 518-20.) Claimant also returned to see Dr. Mirshed on May 7, 2010 and July 6, 2010, and continued to complain of low back pain, anxiety, and sadness. (R. 552-54.) Dr. Mirshed again made similar findings and recommendations to those made at previous appointments. (R. 554, 557.)

Treatment notes from Pillars from around the same time period reveal that claimant remained sober and had completed computer classes. (R. 668-69.) She explained that her mood was less stable when her pain was worse and that she was stressed as a result of family and friends suffering from cancer. (*Id.*)

On July 21, 2010, Dr. Myint completed an arthritis residual functional capacity

questionnaire.  (R. 505-07.)  Dr. Myint reported that claimant suffers from a reduced range of motion, abnormal posture, tenderness, abnormal gait, and a positive straight leg test.  (R. 505.)  He noted that claimant's pain medications cause drowsiness and dizziness.  (*Id.*)  Dr. Myint also reported that claimant suffers from depression and anxiety.  (R. 506.)  Dr. Myint opined that claimant's symptoms would occasionally interfere with the attention and concentration needed to perform simple work tasks.  (*Id.*)  He estimated that claimant can walk half a block before needing to rest, can sit for twenty to thirty minutes at one time, and stand for fifteen minutes at one time.  (*Id.*)  He concluded that claimant can sit, stand, and/or walk for less than two hours in an eight-hour day, requires a cane for walking and standing, and requires a job that permits shifting positions at will.  (R. 506-07.)  According to Dr. Myint, claimant cannot even lift objects weighing less than ten pounds.  (R. 507.)  He estimated that she would be absent from work more than four days per month due to her various impairments.  (*Id.*)  At a follow-up appointment on August 17, 2010, Dr. Myint assessed COPD.  (R. 521.)

On August 20, 2010, Dr. Beresford completed a mental impairment questionnaire.  (R. 508-11.)  Dr. Beresford stated that claimant suffered from poor memory, sleep and mood disturbance, emotional lability, substance dependence (in remission), recurrent panic attacks, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, blunt, flat or inappropriate affect, decreased energy, and generalized persistent anxiety.  (R. 508.)  He noted a GAF of 50.  (*Id.*)  Dr. Beresford reported that claimant's medications cause fatigue and poor concentration.  (R. 509.)  He concluded that claimant experienced moderate restrictions in activities of daily living, marked restrictions in social functioning, constant deficiencies of

8

concentration, persistence, or pace, and repeated (three or more) episodes of decompensation.  (R. 511.)  Dr. Beresford also found that claimant had poor to fair mental ability and aptitude to perform a number of tasks required for unskilled work.  (R. 510.)  He estimated that claimant's symptoms would cause her to be absent from work more than three times a month.  (R. 509.)  Dr. Beresford went on to indicate that claimant's symptoms and limitations persisted despite her sobriety and that claimant reported that her medications helped "a little."  (R. 508, 511.)

On September 9, 2010, after again noting decreased range of motion and tenderness at the lumbar and thoracic spine, Dr. Mirshed referred claimant to an orthopaedic surgeon for evaluation of lumbar spinal stenosis.  (R. 559-60.)  It is unclear if claimant ever followed up on that referral.  Claimant returned to see Dr. Myint on October 18, 2010 and complained that Vicodin was bothering her stomach, and that she was considering switching to Norco after trying her husband's dosage without incident. (R. 523.)  She further reported suffering a shooting pain in both feet since the summer. (*Id.*)

On October 28, 2010, at Dr. Myint's referral, claimant began treatment at APAC Groupe Centers for Pain Management ("APAC").  (R. 636-37.)  Claimant stated that her low back pain had been "tolerable" up until July, but had since become "unbearable." (R. 636.)  She claimed that Vicodin and Mobic had not provided much relief.  (*Id.*) Claimant also reported pain in her feet, which was somewhat relieved by Neurontin. (*Id.*)  The examining physician noted that claimant "has been going to multiple doctors and getting overlapping prescriptions for hydrocodone [or Vicodin]."  (*Id.*)  Upon physical

examination, the doctor noted moderate COPD changes with occasional wheezing, tenderness in the lumbar region extending to the low thoracic region, and within the quadratus lumborum and proximal glutei. (R. 637.) Straight leg testing was negative. (*Id.*) Claimant showed some loss of sensation over the plantar region of her feet. (*Id.*) The doctor increased her Vicodin prescription and scheduled an L4-5 epidural steroid injection, which claimant received on November 9, 2010. (R. 634-35.)

At a follow up appointment on November 23, 2010, claimant reported significant relief from the steroid injection, but continued to complain of severe pain in the right sided lower lumbar spine, worsened with extension, bending, walking, and sitting. (R. 633.) Tenderness in the lower lumbar spine persisted. (*Id.*) A medial branch block was recommended. (*Id.*) By December 21, 2010, claimant's pain had shifted to the left side of the lower lumbar spine. (R. 632.) An MRI showed multiple levels of facet arthropathy throughout the lower lumbar spine. (R. 631.) Again, a medial branch block was recommended, and eventually performed on January 27, 2011. (R. 629-31.) At a follow-up appointment on February 15, 2011, claimant reported she experienced significant relief from the medial branch block. (R. 628.) However, she explained that after helping remodel her home, she now suffered from severe cervical spine and upper extremity radicular pain, as well as pain down her lower extremities to her feet, all of which was "greatly affecting her daily lifestyle." (*Id.*) Among other things, the examining physician noted tenderness throughout the cervical and lumbar spine, and weakness in the lower extremities. (*Id.*) He recommended additional steroid injections for the radicular pain. (*Id.*) Those injections were postponed after claimant reported a gynecological problem. (R. 627.) A later appointment for the injections was also

cancelled due to the same problem.  (R. 534.)

On March 24, 2011, claimant saw Dr. Robert Marseilles at Pillars and reported that she had been abstinent for sixteen months.  (R. 666.)  At that time, she was "a little on edge" due to the possible foreclosure of her house, and suffered from intermittent insomnia.  (*Id.*)  Dr. Marseilles increased her Zoloft prescription and prescribed Ambien for her sleep problems.  (*Id.*)  The following month, Dr. Marseilles noted that claimant was mildly hyperphonic, tangential, demonstrative, and distractable.  (R. 665.)  He warned claimant about the possible dangers of prescription drug dependency, and opined that claimant may suffer from adult attention deficit disorder.  (*Id.*)

By mid-May 2011, claimant reported that her anxiety was "manageable" during the day, though she remained stressed about her disability claim and possible foreclosure.  (R. 664.)  Two weeks later, claimant reported she was sleeping well and maintained the ability to multi-task and complete tasks.  (R. 663.)

Claimant returned to see Dr. Myint on June 17, 2011, at which time he prescribed a cane.  (R. 682-83.)

## 2.     Agency Consultants

Czarnecki underwent a mental status evaluation on February 12, 2010 with Dr. Nathan Wagner.  (R. 420-26.)  Claimant reported painful back issues, which date back to 1989, when her son's father threw her down the stairs, and which were aggravated in 2000 when she was pushed against a doorknob by her son.  (R. 420-21.)  She also reported difficulties with her hands, and a clubfoot.  (R. 423.)  As a result of her debilitating pain, she is unable to work or perform other activities, thus leading to feelings of depression and anxiety.  (R. 421.)  She does not want to get out of bed, often

11

isolates herself, has an increased need for sleep, and a decreased appetite. (*Id.*) Claimant reported periodic panic attacks, during which she experiences shortness of breath, feels shaky, and has a great sense of fear. (*Id.*) Claimant stated that she needs assistance to bathe and is unable to cook or do household chores. (R. 423.) According to claimant, she had been sober for two years, but had a "slip" several months prior. (R. 422.)

Dr. Wagner noted a dysphoric affect. (R. 426.) Dr. Wagner's mental evaluation revealed that claimant's immediate memory, recent memory, and remote memory remained intact. (*Id.*) Her fund of information was adequate, her abstract thinking was fair, and her judgment and insight also appeared to be adequate. (*Id.*) Dr. Wagner assessed major depressive disorder, panic disorder without agoraphobia, a history of alcohol abuse, and a rule out for attention deficit hyperactivity disorder. (*Id.*) He assigned Czarnecki a current GAF of 40. (*Id.*)

Also on February 12, 2010, claimant underwent an internal medicine consultative examination with Dr. Norma Villanueva. (R. 430-41.) At that time, she described her back pain as a ten on a ten-point scale. (R. 430.) She explained that she takes pain pills, but that the epidural injection she received did not work. (*Id.*) She has also been told to have surgery, but cannot afford it. (*Id.*) She reported that walking over half a block increases her pain and that she does not climb stairs. (*Id.*) According to claimant, she suffered an injury to her right hand and cannot lift more than five pounds, but had not sought treatment. (R. 431.) Claimant also reported a history of seizures, possibly provoked by panic attacks. (*Id.*) She stated that she stopped consuming alcohol nine years ago. (*Id.*)

Dr. Villanueva's physical examination revealed decreased breath sounds and wheezing. (R. 432.) She also observed a slow gait without an assistive device, and noted that claimant had mild difficulty getting on and off the exam table. (*Id.*) Claimant could not heel/toe walk or squat due to pain. (*Id.*) There was tenderness in the lower back and decreased range of motion, with associated pain, in the lumbar spine. (R. 436.) All other range of motion measurements were within normal limits, as was hand dexterity. (R. 434-37.) Pre-med pulmonary testing showed mild obstruction. (R. 439.) Dr. Villanueva assessed lumbar arthritis, grand mal seizures, panic attacks, and a history of an enlarged heart, injury to the right hand, and fatty liver. (R. 432-33.) She also noted that claimant reported a herniated disc at L4, S1. (R. 433.)

On March 4, 2010, Dr. Donna Hudspeth completed a psychiatric review technique. (R. 445-58.) She assessed major depressive disorder, anxiety, and a history of alcohol abuse. (R. 448-53.) According to Dr. Hudpseth's review of the record, claimant experienced mild limitations in activities of daily living and maintaining social functioning; moderate limitations in maintaining concentration, persistence, or pace; and had suffered one or two episodes of decompensation. (R. 455.)

Dr. Hudspeth also completed a mental residual functional capacity assessment. (R. 459-62.) Dr. Hudspeth noted moderate limitations in claimant's ability to understand and remember detailed instructions and her ability to carry out detailed instructions. (R. 459.) In all other categories, Dr. Hudspeth found no significant limitations. (R. 459-60.) In the narrative portion of her assessment, Dr. Hudspeth indicated that claimant has sufficient cognition, memory, and thought processing skills to perform at least two to three simple repetitive work tasks, within physical limitations. (R. 461.) She also

13

reported that claimant could interact appropriately with a supervisor and fellow employees, relate to the structure of a work routine, adapt to ordinary work changes, and make ordinary work decisions. (*Id.*)

On March 8, 2010, Dr. George Andrews completed a physical residual functional capacity assessment. (R. 488-95.) According to Dr. Andrews, claimant can lift and/or carry twenty pounds occasionally, and ten pounds frequently; can stand and/or walk for six hours in an eight-hour work day; and sit for six hours. (R. 489.) He found no limitations in her ability to push or pull. (*Id.*) He based these conclusions on the findings of the internal medicine consultative exam. (*Id.*) Dr. Andrews also concluded that, due to her back pain and degenerative disc disease, claimant can only occasionally climb ramps and stairs, and never ladders, ropes, or scaffolds; and can occasionally stoop and crouch. (R. 490.) Dr. Andrews found no other postural, manipulative, visual, or communicative limitations. (R. 490-92.) He did conclude that claimant should avoid concentrated exposure to fumes and hazards, such as machinery and heights, due to decreased breath sounds and reported seizures. (R. 492.) On July 22, 2010, Charles Wabner and Glen Pittman affirmed the assessments of Drs. Andrew and Hudspeth. (R. 619-21.)

### C.  Claimant's Testimony

Czarnecki appeared with counsel before ALJ Sayon on June 21, 2011 and testified as follows. She was born on February 6, 1961, making her fifty years old at the time of the hearing. (R. 35.) Czarnecki is right handed, stands five feet, four inches tall, and weighs 140 pounds. (R. 36.)

Czarnecki completed high school, after which she worked as a brokerage phone

clerk for various firms through 2000.  (R. 35, 39.)  Czarnecki also showed dogs

professionally, cleaned houses, and worked as a waitress.  (R. 41-43.)  Since her

alleged onset date in August 2007, Czarnecki worked for two to three months as a sales

clerk, and temporarily at various waitressing jobs.  (R. 36-38.)  She stopped working in

those positions due to her back pain and because she could no longer lift the loads

required.  (R. 37-38.)

Czarnecki testified that she has suffered from chronic back pain for

approximately fifteen years, which worsened in 2008.  (R. 44-45.)  She rated her back

pain an eight on a ten-point scale, and explained that the pain also radiates to her neck.

(R. 45.)  She previously underwent steroid injections, but had to stop after excessive

bleeding.  (*Id.*)  Czarnecki has suffered from neck pain since being ejected from a

vehicle when she was five years old.  (*Id.*)  Her neck pain has worsened recently due to

osteoarthritis.  (*Id.*)  Both her neck pain and back pain cause discomfort when lifting,

turning, and sitting still, though her back pain is the bigger problem.  (R. 46.)  Czarnecki

also has osteoarthritis in both hands and feet, which causes swelling on a daily basis.

(*Id.*)  While working as a waitress, Czarnecki often wore braces on her back, right hand,

right knee, and right foot.  (R. 47.)

Czarnecki testified that from October of 2010 and May of 2011, she "couldn't get

off the couch" due to her feelings of depression and anxiety, as well as her back pain.

(R. 48.)  She often has crying spells, is very irritable, and suffers from panic attacks on a

daily basis.  (R. 49, 56.)  Her panic attacks are triggered by loud noises, feelings of

nervousness, or being in a small area.  (R. 56.)  She testified that her medications do

help.  (R. 48-49.)  Czarnecki has a history of drug and alcohol abuse, but has not used

illegal drugs since 1990, and has not consumed alcohol since December of 2010. (R. 50-51.)

Czarnecki resides with her husband, who helps her get out of bed and bathe. (R. 52, 57.) On a typical day, Czarnecki sits with an ice pack, does therapy stretches, and tries to move around as much as possible, with occasional breaks. (R. 52.) She also swims in her pool to relieve her pain. (*Id.*) She only eats once a day. (R. 58.) Her husband does all of the household chores because she is physically and mentally unable to do the chores, and has been unable to do so since 2007. (R. 53, 57.) Czarnecki testified that she sometimes stops breathing in the middle of the night and wakes up in a panic. (R. 57-58.)

Czarnecki testified that she can sit for fifteen to twenty minutes at a time, stand for ten minutes, and walk with her cane for about a half a block. (R. 53-54.) She explained that she had been using the cane for the previous two or three months on her own and at the doctor's suggestion. (R. 53.) Before using the cane, she was only able to walk in the backyard, and only then by holding on to objects for support. (R. 58.) Czarnecki did not believe she could lift or carry a gallon of milk. (R. 54.)

Czarnecki attends AA meetings three to four times a week. (R. 51.) As for hobbies, she enjoys reading her AA books and attending church. (R. 54.) While attending church, or her AA meetings, she has to get up and walk around about four times in an hour. (R. 55.) Czarnecki does not have any difficulty getting along with others at church or meetings. (R. 54.) Back in 2010, Czarnecki took a computer class through her local library. (R. 59-60.)

**D.    Vocational Expert's Testimony**

16

Vocational Expert Clifford Brady (the "VE") also testified at the hearing before ALJ Sayon. The VE first classified claimant's past work. He testified that claimant performed her waitressing jobs at both the light and medium levels, and further explained that the position is at the low end of semiskilled. (R. 63.) As for claimant's sales clerk jobs, the VE described those positions as light, and again at the low end of semiskilled. (*Id.*) Lastly, the VE classified claimant's work as a brokerage clerk as light and semi-skilled. (R. 64.)

Next, the ALJ asked the VE to consider a hypothetical individual of claimant's age, education, and work experience who was limited to light work with the following additional restrictions: no climbing of ladders, ropes, or scaffolding; only occasional climbing of ramps and stairs; occasional crouching and stooping; and no concentrated exposure to hazards or respiratory irritants. (R. 64.) The ALJ further limited the hypothetical individual to work involving simple instructions, routine, repetitive tasks, and only occasional decision making and changes in the work setting. (R. 64-65.) The ALJ then asked the VE whether such an individual would be able to perform any of the claimant's past work. (R. 65.) The VE responded in the negative. (*Id.*)

The VE went on to explain that the hypothetical individual could perform other production-type jobs in the economy, such as production assembler (8,000 jobs available in the region), small parts assembler (6,000 jobs), and electronics worker (2,000 jobs). (R. 65.) When asked if limiting the hypothetical individual to having no interaction with the public would preclude those jobs, the VE testified that it would not. (*Id.*) The ALJ then asked if the jobs would be limited if the individual was unable to perform fast paced production. (R. 65-66.) The VE responded that 60% of the jobs he

17

described would remain available with that additional restriction.  (R. 67.)  However, the VE did testify that all employment would be precluded if the individual was off task 30% of the day, missed three days of work a month, or required a ten minute break every hour.  (R. 67-68.)

## II.    Legal Analysis

### A.    Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)).  We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Id.*  While the ALJ "must build an accurate and logical bridge from the evidence to her conclusion," she need not discuss every piece of evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001).  The ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace

18

the path of the ALJ's reasoning.'"  *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993)

(per curiam) (*quoting Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985)).

### B.    Analysis Under the Social Security Act

In order to qualify for DIB or SSI, a claimant must be "disabled" under the Act.  A

person is disabled under the Act if "he or she has an inability to engage in any

substantial gainful activity by reason of a medically determinable physical or mental

impairment which can be expected to last for a continuous period of not less than twelve

months."  42. U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The ALJ must consider the

following five-step evaluation to determine whether the claimant is disabled: "(1)

whether the claimant is currently employed, (2) whether the claimant has a severe

impairment, (3) whether the claimant's impairment is one that the Commissioner

considers conclusively disabling, (4) if the claimant does not have a conclusively

disabling impairment, whether he can perform past relevant work, and (5) whether the

claimant is capable of performing any work in the national economy."  *Dixon*, 270 F.3d

at 1176.  The claimant has the burden of establishing a disability at steps one through

four, and at step five the burden shifts to the Commissioner.  *Knight v. Chater*, 55 F.3d

309, 313 (7th Cir. 1995).

ALJ Sayon applied this five step analysis.  At step one, the ALJ determined that

claimant has not engaged in substantial activity since August 1, 2007 despite having

worked for short periods as a part-time waitress and part-time sales clerk.  (R. 13.)  At

step two, the ALJ found that claimant has the following severe impairments:

degenerative joint disease of the lumbar spine, spinal stenosis, levorotoscoliosis of the

thoracolumbar spine, chronic obstructive pulmonary disease, obesity, depression, anxiety, and a history of alcohol and drug abuse.  (R. 13-14.)  At step three, the ALJ concluded that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 14-16.)

Next, the ALJ found that the claimant has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) with no climbing of ladders, ropes or scaffolds; occasional crouching, stooping and climbing of ramps and stairs; and no concentrated exposure to hazards or respiratory irritants.  (R. 16-22.)  Additionally, the ALJ found that the claimant should be restricted to work involving simple instructions; routine, repetitive tasks; only occasional decision making and changes in work setting; and with no fast paced production requirements.  (*Id.*)  The ALJ went on to conclude, at step four, that claimant cannot perform any past relevant work.  (R. 22.)  However, at step five, the ALJ determined that, considering claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform, such as production assembler, small parts assembler, and electronics worker.  (R. 23.)  As a result, the ALJ found that claimant has not been under a disability from August of 2007 through the date of her decision.  (R. 24.)

Claimant now argues that the ALJ (1) failed to properly consider the opinions of her treating physicians; (2) failed to consider her GAF scores; (3) improperly assessed her credibility; and (4) failed to consider her obesity.  We address each issue in turn

below.

**C.    The ALJ Properly Addressed the Opinions of Claimant's Treating Physicians.**

Claimant also argues that the ALJ failed to properly consider the opinions of her treating physicians Dr. Beresford, Dr. Mirshed, and Dr. Myint.  As a general matter, the ALJ will give the opinion of a treating physician controlling weight because treating physicians are "most able to provide a detailed, longitudinal picture" of the claimant's medical condition.  20 C.F.R. § 404.1527(c)(2).  However, a treating physician's opinion concerning the nature and severity of a claimant's condition receives controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with substantial evidence in the record.  *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).  "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine what amount of weight to afford the opinion.  *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (*citing* 20 C.F.R. § 404.1527(c)(2)).

The ALJ must always give "good reasons" for his determination as to the amount of weight afforded a treating physician.  20 C.F.R. § 404.1527(c)(2).  Nonetheless, the Seventh Circuit has held that an ALJ's decision to discount a physician's opinion is subject to a very deferential, or "lax," standard of review.  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).  As long as the ALJ "minimally articulated" his reasoning, a

reviewing court must allow that decision to stand.  *Id.*

### 1. Dr. Beresford

According to claimant, the ALJ failed to properly consider the August 20, 2010 mental impairment questionnaire prepared by Dr. Beresford.  In that questionnaire, among other things, Dr. Beresford opined that claimant experienced moderate restrictions in activities of daily living, marked restrictions in social functioning, constant deficiencies of concentration, persistence, or pace, and repeated (three or more) episodes of decompensation.  (R. 511.)  Dr. Beresford also found that claimant had poor to fair mental ability and aptitude to perform a number of tasks required for unskilled work and would be absent from work more than three times per month.  (R. 509-10.)  In deciding not to give this opinion controlling or great weight, the ALJ stated that it was "not supported by treatment notes, which document good functioning on medications, and normal memory and concentration."  (R. 21.)

As explained earlier in the ALJ's opinion, treatment records from Pillars and other sources documented minimal psychiatric treatment and improved conditions with treatment and sobriety.  The ALJ also pointed out how Dr. Beresford previously found that claimant exhibited normal motor behavior, normal thought content, normal affect, and found no cognitive defects.  Similar findings were made at the consultative examination with Dr. Wagner.  Though the claimant cites to references in the record regarding her anxious and depressed mood, and Dr. Beresford's comment that symptoms persisted despite her sobriety, we disagree that claimant's improvement as it relates to her mental health was so inconsistent and unpredictable so as to render the ALJ's treatment of Dr. Beresford's opinion to be insufficient.

22

### 2.    Dr. Mirshed

As for Dr. Mirshed, he opined that the claimant should perform no bending, lifting, or stooping.  In affording this opinion little weight, the ALJ found it to be inconsistent with the medical records and Dr. Mirshed's own treatment notes.  As the ALJ properly pointed out, at multiple appointments, Dr. Mirshed only noted a reduced range of motion with back flexion and extension, and tenderness in the lumbar and thoracic spine, but found no other significantly limiting findings that would support his somewhat extreme opinion.  Indeed, as the Commissioner notes, Dr. Mirshed repeatedly found that claimant had a normal gait, grossly normal tone and muscle strength, and a negative straight leg test.  (R. 553, 556, 559.)  Though claimant cites to Dr. Mirshed's repeated notations of back pain, such notations were of course based on claimant's subjective complaints.  *See Givens v. Colvin*, --- Fed. Appx. ----, No. 13-2000, 2013 WL 6623179, at *6 (7th Cir. Dec. 17, 2013) ("An ALJ may give less weight to an opinion that appears to rely heavily on the claimant's subjective complaints, even if the source of that opinion had examined the claimant.").  As such, we find that the ALJ gave sufficient reasons for affording Dr. Mirshed's little weight.

### 3.    Dr. Myint

In March of 2010, a month after he began treating claimant, Dr. Myint opined that the claimant could not sit, stand, or walk, for more than ten minutes or lift more than five pounds.  Later, in July 2010, Dr. Myint concluded, among other things, that claimant would be restricted to full-time sedentary work and needed to miss four days of work per month.  The ALJ found these assessments to be sympathetic, but inconsistent with the objective medical record and Dr. Myint's own treatment notes, which included minimal

23

findings and treatment with prescription pain medication.  With respect to the first opinion, the ALJ specifically noted that Dr. Myint offered it soon after he began his treatment relationship with claimant.  Again, unlike claimant, we find the ALJ's reasons for discounting Dr. Myint's opinions to be sufficient.

### D.     The ALJ's Failure to Discuss Claimant's GAF Scores Does Not Require Remand.

Next, we address claimant's assertion that the ALJ failed to properly address her GAF scores.  As discussed above, claimant was awarded a GAF score of 50 by her treating physician at Pillars in both 2007 and 2010.  Also in 2010, consultative examiner Dr. Wagner assessed a GAF score of 40.  According to claimant, the ALJ was required to consider these "conflicting" scores when assessing the claimant's mental capacity to work.  We disagree.

The GAF score reflects both severity of symptoms and functional level.  Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. text revision 2000).  A GAF score of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  *Id.*  A score of 41-50 denotes serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.*  To be clear, on the GAF scale, the lower the score, the more serious the symptoms.

In support of her argument that the ALJ failed to properly consider her GAF scores, claimant cites to *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012).  There, the Court found reversible error in the ALJ's failure to properly address the opinion of a treating physician regarding the claimant's mental ailments, especially in light of her

24

"severe" GAF scores.  Claimant also cites to a case in which the Court found reversible error in the ALJ's decision to rely on the higher, less limiting GAF score, while ignoring other lower GAF scores.  *See Walters v. Astrue*, 444 Fed. Appx. 913, 918 (7th Cir. 2011) (finding reversible error where the ALJ cited the claimant's higher functioning GAF scores of 61 and 70, but ignored a previous GAF score of 45).

As the Commissioner argues, that is not the case here.  The ALJ did not simply cite the higher functioning GAF scores, and ignore the lower functioning score.  In fact, he did not rely on the scores at all, but instead properly cited to the more narrative results of the various mental status examinations that contained those GAF scores. *See Bayless v. Astrue*, No. 11 C 3093, 2012 WL 3234044, at * 17 (N.D. Ill. Aug.6, 2012) (finding that, in light of the ALJ's extensive discussion of the narrative findings provided by the medical expert, the ALJ's failure to specifically mention the claimant's GAF scores did not serve as a basis for a remand).  And, as courts have held, "GAF scores do not rule the day."  *Triplett v. Colvin*, No. 12 C 4382, 2013 WL 6169562, at *8 (N.D. Ill. Nov. 25, 2013); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score.") (*quoting Wilkins v. Barnhart*, 69 Fed.Appx. 775, 780 (7th Cir. 2003).  Because the ALJ otherwise articulated how she reached her conclusion regarding claimant's mental impairments, including her consideration of the opinions in the record, we find no reversible error in the ALJ's failure to discuss claimant's GAF scores.

### E.      The ALJ's Credibility Determination Is Not Patently Wrong.

Claimant argues that the ALJ failed to properly consider her allegations of pain

and assess her credibility. Once the ALJ determines that a claimant's impairments could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, or functionally limiting effects" of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2. When statements about such effects are not substantiated by objective medical evidence, the ALJ must make a credibility determination based on the entire case record. *Id.* In making a credibility determination, the ALJ should consider the following factors in addition to objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication the claimant takes to alleviate pain; (5) treatment, other than medication, that the individual has received for relief of pain; (6) any other measures the individual uses to relieve pain; (7) and any other factors concerning the individual's functional limitations. *Id.* at *3.

It is well settled that the court must afford the ALJ's credibility determination special deference because the ALJ is "in the best position to see and hear the witnesses and assess their forthrightness." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Consequently, we will reverse a credibility determination only if it is "patently wrong." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). To be patently wrong, an ALJ's determination must lack "any explanation or support." *Elder,* 529 F.3d at 413-14; *see also* SSR 96-7p, 1996 WL 374186, at *2 (The ALJ's decision must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave

26

to the individual's statements and the reasons for that weight.").

Here, the ALJ gave specific reasons for discounting claimant's allegations of disabling pain and limitations, first citing to the lack of consistent objective medical evidence supporting those allegations.[2]  *See Jones v. Astrue,* 623 F.3d 1155, 1161  (7th Cir. 2010) ("Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration.").  The ALJ went on to note that, despite her allegations of pain, claimant was able to work as a waitress (notably, for six months in one position), and helped to remodel her home, albeit with subsequent pain.  The ALJ found such activity to be inconsistent with the claimant's extreme allegations at the hearing regarding her limited mobility for the past several years.  The ALJ also pointed out claimant's inconsistent statements to various treating and consulting physicians regarding her history and intensity of her back pain, as well as her alcohol use.  *See Triplett*, 2013 WL 6169562 at *9 (finding that, among other things, inconsistent statements regarding a history of substance abuse, supported the ALJ's credibility finding).  As directed by SSR 96-7p, the ALJ also considered claimant's treatment history and the effectiveness thereof.[3]

Given the deferential nature of our review of an ALJ's credibility determination, we cannot find that the ALJ's determination was patently wrong here.

---

[2] Strangely, plaintiff argues that the ALJ failed to consider the September 2009 MRI scan, when in fact the ALJ did mention that scan in her opinion.  (R. 18.)

[3] We note that the ALJ also opined that the timing of claimant's disability claim called into question her credibility because it may have been filed right after her husband lost his job.  We question this reasoning because the record appears to indicate that claimant may have previously applied for disability benefits. (R. 175.)  However, because the ALJ's credibility determination was otherwise sufficient, we find this potential misrepresentation of the record to be harmless error.

**F.    The ALJ Properly Considered Claimant's Obesity.**

Lastly, we find no error in the ALJ's treatment of claimant's obesity.  Indeed, the ALJ "must factor in obesity when determining the aggregate impact of an applicant's impairments."  *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) (*citing Martinez v. Astrue*, 630 F.3d 693, 698-99 (7th Cir. 2011)); *see also* Social Security Ruling ("SSR") 02-1P, 2000 WL 628049 (2002).

Here, the ALJ acknowledged claimant's obesity as a severe impairment and explicitly stated that she considered that impairment in her Step 3 listing analysis.  (R. 14.)  Later, when assessing claimant's RFC, the ALJ noted that claimant's height and weight in fact only placed her in the "upper end of normal weight to the overweight range" on the BMI scale.  (R. 19.)  We also note that claimant has not pointed to any evidence in the record indicating that her obesity further limits her ability to work.  *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (finding harmless error where the claimant failed to "specify how [her] obesity further impaired [her] ability to work.") (*quoting Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).  All of this leaves us to conclude that the ALJ properly considered claimant's obesity.

**III.    CONCLUSION**

For the foregoing reasons, plaintiff's motion for summary judgment is denied, the Commissioner's motion for summary judgment is granted, and the Commissioner's previous decision to deny benefits is affirmed.  It is so ordered.

**ENTERED:**

*Michael Mason*

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:**      **February 24, 2014**